I'd like first to address two procedural issues that have to do with what is and is not in front of this court. The first being the cross-appeal issue and the other the mootness question. The pleadings in this case on our part were a counterclaim that contained a count for a declaratory judgment that the option under Section 3 of this support agreement had not been validly exercised. Antelope Valley had a complaint on file which contained a corresponding count asking for the opposite relief, a declaratory judgment declaring that the option had been exercised. The district judge's decision ruled in our favor on both of those counts. He decided that we were the prevailing party on our count for a declaratory judgment that the option was not exercised and conversely that we were the prevailing party on their count seeking a judgment that the option had been exercised. At page 43 of their brief they make it clear that what they're seeking is that that decision be reversed, that the district judge's decision on the option issue be reversed. Now I believe that there's a controlling case here on this issue that should be dispositive which is the United States Supreme Court decision in El Paso Natural Gas which is cited in our brief. It's a modern decision decided in 1999. Interestingly and I think significantly it's a unanimous decision of the U.S. Supreme Court with one opinion filed by Justice Souter. And in that case the Supreme Court held that that absent a cross appeal a litigant may not attack a judgment entered by the court below. But counsel isn't there a difference if the basis for the argument is to offer an alternative basis to affirm the district court's holding as opposed to I understand that line of reasoning, Your Honor, but I don't believe there is any case cited in either of the briefs where that rule was applied in a situation where the opposing party had a counterclaim on file seeking affirmative relief that was contrary to the alternative line of reasoning that the appellant or the appellee who has not filed a cross appeal is advocating. How would that make a difference the fact that there's a counterclaim or not? We had a, this case started over the section 3 option issue and we had a counterclaim on file seeking a determination that our title to this property was free and clear of any option. I understand. And Why does that make a difference to the procedural point? Because we have a judgment in our favor that is that the that the Antelope Valley is asking you to reverse. You don't have a judgment in your favor. The judgment actually was entered in favor of Antelope Valley. You had a ruling in your favor. That's different. Actually, I think, Your Honor, there is a piece of paper entitled Final Judgment in which the court determines that we are the prevailing party on our counterclaim. Where is that in the record that has a judgment in your favor? Five. Five. At E.R. 007 paragraph three. Okay. Entry of Final Judgment on, where is it saying there's a judgment in your favor? E.R. 007 paragraph three. Okay. It says you are declared to be, you shall be deemed prevailing party. Right. That's not the same as entering judgment on your, that's a term of art. I would submit, Your Honor, since this document is a final judgment, that those things within it are a judgment order. I understand your argument. The, I think there's some significant language in the El Paso decision that I'd like to bring to your attention. The court stated that there was some uncertainty as to whether this rule was a rule of jurisdiction or a rule of practice to which there could be exceptions. But the court noted that in two centuries of repeatedly endorsing the cross-appeal requirement, not a single one of the Supreme Court's holdings had ever recognized an exception to the rule. The court then went on to say that the rule had, quote, been continuously repeated and expressed by the court in emphatic terms, and that a athlete may not, without filing a cross-appeal, seek to attack a judgment entered below or seek to reverse a judgment entered below. Again, the three cases that, on which our opponents, I beg your pardon? Okay, I won't interrupt you. I may be repeating what Judge Wallinson already asked. He can't attack the judgment. But the judgment contains some orders for payments that have been made. He's not attacking that. Your opponent's not attacking that. He's saying that the judgment's fine. We're all for the judgment. I've got some reasons why I want to argue it should be affirmed, but I'm not attacking the judgment. Well, he, of course, is happy and satisfied with the judgment in his favor, but he is dissatisfied with the judgment that was adverse, which is the judgment in our favor which held that the option had not been exercised and freed our title of the encumbrance of the option. All right, I get your point now. I understand your point. On the mootness issue, our opponent argues that because we complied with the order and conveyed the property that we no longer have a right to appeal from the judgment of specific performance. The case that I believe is controlling on that and should be dispositive is the decision of this court in Hawaiian Paradise Park versus Friendly Broadcasting. There, the fact-setting was in substance the same as ours. There were a buyer and seller that entered into a contract for the sale of real estate. The seller declined to close, taking the position that it was not obligated under the terms of the contract to close. The buyer brought a case for specific performance and prevailed. There was a judgment of specific performance issued. The seller then complied with the decree and conveyed the title, closed the sale, but filed an appeal. Again, the buyer argued, just as they do here, that the case was moot because the seller had closed. This court said no, the case was not moot and noted that ordinarily, the failure to seek a stay pending appeal doesn't affect the right to appeal and pointed out that it's essentially a question of intention. Whether or not there is an intention on the part of a party by either performing under a decree or accepting the benefits of a decree to bring the case to an end. And in that case, the court stated it this way. After stating that general principle that it's a matter of intention, the court stated that it seems to us that throughout all of the negotiations between the parties relating to the performance under the decree of specific performance, that Hawaiian's purpose to reserve its right to appeal and Friendly's knowledge of that purpose was made clear so as to negate any mutual manifestation of an intention to bring the litigation to an end. And predicated on that, the court held that the case was not moot and the appeal could continue despite having performed under the decree. Now that intention point is definitely present in our case. The intention to reserve the right of appeal is evidenced by the fact that in our case, after the decree was entered, the parties entered into a transfer agreement to establish the mechanism and the details by which this conveyance and payment would be accomplished. And that document is in the supplement to the record that our opponent filed with leave of court. I'm a little worried that you've spent, of your 15 minutes now, you're down to four and we haven't got what's real here. Okay. Well, I wanted to be sure that we were talking about what we could and couldn't talk about. Well, I understand. Here's what I'd like to hear on the merits. Our point is we start with section two of the support agreement, which provides for a payment to be made at the time of the maturity of this financing. The payment was not made. This occurred after the case had been pending for several months. The financing matured. We demanded payment of the amount due. What was that amount? What's that? What was that amount? Round number is $20 million. We demanded payment. When they declined to pay, we amended our counterclaim to add account for a money judgment for the amount due. So you were seeking $20 million from Antelope Valley for what? What was the basis for the $20 million? Section two of the support agreement. Right. And so what was that for? The $20 million was for what? To retire the financing provided by the bank on the project. Well, I guess the question is who gets the building. The question is who gets the building. And our position is that because they did not exercise the option, that CERDEL is entitled to retain the building for the remainder of the term of the ground lease. How long would that have been, 50 years? It was originally 50 years. There's about 40 years left. So under your theory, Antelope Valley would have to pay for the building and you keep the building for pretty much its useful life. That's correct. And you think section two, that's what section two was for? That's what section two says. You contemplate it? Yes, I do. Given the whole of the contract, where to come to the idea that you would get all the money and keep the building? Judge? I mean, I realize I'm from Idaho. And I'm not a California guy. So I know California has way different ways to interpret their contracts than anybody else. But here I am. I'm suggesting to myself that under this contract as I read it, you're to get $20 million and keep the property. In Idaho, even if I didn't look at the contract itself, that would seem as absurd and unfair as I could see. And even under California law, I wouldn't have to go along with that. Even if the contract language said it, I mean, I wouldn't have to go there. Well, I don't know exactly what you mean by that. Well, I mean, the honest truth is I'd read this contract in such a way I could read it such that it'd get there or I could read it in such a way that it wouldn't give me an absurd and unfair result. I'm using California language here. And I wouldn't read it that way. If you look at the purpose of the contract was for Antelope Valley to build a building, not to give a building away. That's the thing that has me a little skeptical about that interpretation of the agreement. In my former life, I was an advisor to a hospital district. And I know that they tried to avoid the public purchasing requirements at all costs, the public bidding requirements. So they had a lot of these, sale, lease, bag, design, bill. But the purpose of them is to get the building built for the use of the hospital district. And it defies common sense and logic to me that they would agree to build a building only to give that building away to kind of the middle man. Well, the element by which they would be able to accomplish that was by exercising the option. Well, let's talk about the option. Now, your position was that the option was not exercised in a timely manner. Right. And Antelope Valley could exercise the option any time within six months of the stated expiration date, right? Yes. But the stated expiration date was extended several times. So how did the option expire if the stated expiration date was extended? The stated expiration date for this portion of the financing was not extended. Well, but where does it say that in the agreement? It says it in section. Recite the language that says for this part. At the time the contract was entered into, this was the only part. Well. But it says it can be extended, though. Yes. But they didn't exercise this. At the time this option was not exercised, the stated expiration date had not been extended. It was subsequently extended. We're talking about the expiration date of the letter of credit, right? Right. Yes. Well, there were numbers of extensions. But not before the option expired. That's a chicken or egg question. Well, I don't know. I don't know. I mean, there were not. I'm not talking about extensions of the letter of credit that are just attributable to this project. I'm talking about extensions of the letter of credit attributable to any project. Yes. And there still weren't any extensions prior to the time. I don't believe so, Judge. I believe that when other projects were added, stated expiration dates for those projects were established. But the stated expiration. Only one letter of credit. There's one letter of credit with multiple tranches. And as new projects were added, stated expiration dates for those projects were. . . Not linked to a specific project, though. The expiration dates were not linked. They were just, you said that the stated expiration date is extended. Respectfully, Judge, that I don't, that's not correct. Okay, show me, get the extensive record and show me in the extensive record where the stated expiration date was linked to a particular project. You can get your record. This is a very important point. Let's go to the first. . . You can bring your record to the lectern, please, so they can record your answer. Okay, take your time. Okay. As for Jill, I don't know that that document is in there. We're going to ask for it to be placed in the record. What document? A document doing the extension that you're referring to. Well, you made a statement that the extensions of the stated expiration date were specifically linked to particular projects. And I'm asking you, where in the record is that manifest? I don't believe that portion of the record was included in the excerpts. We asked for the. . . Well, even if it's not in the excerpts, where is it in the record? I don't have it with me because we considered that issue not before the court. I mean, Judge Wright discusses this issue in some detail in his memorandum of decision. And I would refer you to that for the line of reason. Well, this is de novo review. I understand. All right. You've exceeded your time. Is there anything else you wanted to talk about? No, thank you. All right, thank you. We'll give you a minute for rebuttal. Thank you. May I please the court to appall C. Workman on behalf of the Antelope Valley Health Care District. Let me first address the issue of the cross-appeal. The court is exactly correct that we're not trying to do anything here other than affirm the judgment. And if the court looks at the El Paso case, the Supreme Court case cited by counsel, and looks at the language in that case and that case as it is discussed in and interpreted by this Court's decision in the Ribeiro case cited in our papers, it's extremely clear that as long as a party is not seeking to expand or enlarge its rights under the judgment or seeking to lessen those of the other party, then it may attack on appeal an issue that is not the subject of a cross-appeal. That's all we're doing here. Section 3, the option provision, is simply another vehicle in the contract that would allow an unwinding of the financing transaction. All it did was provide that Antelope Valley could repurchase the ground lease for the option price. Section 3 did that. A judge, rightly believed, was confused and happened to confuse the stated permanent reduction date in the reimbursement agreement with the stated expiration date of the letter of credit. But he did understand that under the contract, Antelope Valley had the right to purchase for the option price the ground lease and thereby unwind the transaction and get the building back. Counsel, what's your response to opposing counsel's position that the stated expiration date extensions were tied to particular projects under the umbrella letter of credit? It's preposterous under the documents and it is contrary to several documents executed by Citadel in which the extension of the stated expiration date is acknowledged by Citadel. Frankly, Your Honor, it's borderline cynical. These documents come from Citadel. They know what they need. It's very clear under Section 3 that the option is tied to the stated expiration date. Why then did Citadel argue that, no, it wasn't tied to the stated expiration date, it was tied to the stated permanent reduction date? That's plainly not what the support agreement in Section 3 says. And then we have myriad documents, all of which are part of our supplemental excerpts of record, and I can go through you with them. The stated expiration date is defined. Well, let me just give you an example, because the court point blank asked counsel whether or not there had been any extensions of the stated expiration date before the August 2004 period when Citadel contends that the option expired. By the way, Citadel's contention as to when the option expired is different from Judge Wright's. So it's curious that counsel would refer you to Judge Wright's analysis as to... What's Judge Wright's date that he... And what was that based on? That was based, actually it was February of 2006, and I believe that was based on an August 2006 stated permanent reduction date. Okay. I suppose the reason for linking it to that instead of the letter of credit is that it really is the time that the payment on the letter of credit is to be made by this project. But from the standpoint of the bank, it wouldn't have mattered, and the support agreement existed from the standpoint of the bank. If the financing came due and it wasn't paid, there wasn't going to be a period of time after that in which... that the letter of credit was still in effect for the other Citadel financings during which this option would have been exercised. The bank would have immediately sorted to Section 5. Everything closes. Everything shuts down. It's a theoretical impossibility. Of course, so far what the judgment below really did was take Section 5. And at that point... And that's what so far hasn't been mentioned. I neither say. Section 5 is straightforward. Section 5 simply said it was there for the protection of the bank. Remember that the bank is an assignee of all of Citadel's rights under the support agreement. Let me just interrupt you just a minute. If the bank is an assignee of all rights, did the bank ever extend the credit, the date themselves? Only the bank could extend the credit. Only the bank. Well, I mean, but we're talking about the date. Well, let me... Did the bank ever extend that? Yes. And let me refer, Your Honor, to the supplemental... And then back to his question. Supplemental excerpt of record. Let's see here. This is page 2 of the supplemental excerpt of record. And what you find here is, in August 12, 2002, amended and restated revocable letter of credit. So what the bank does here is it takes up the first draft and just throws it away. It actually reissues the letter of credit. And you can tell that Citadel Properties Lancaster is covered by it because it's actually Citadel's... that Citadel entity is actually referred to in the exhibit, again, where they actually list who the outstanding project borrowers are. This is actually executed because it's a specimen and it's not signed. Well, this is what was admitted into evidence. In any event, I apologize. My colleague had a great question. Your Honor, there are other documents in which the bank signs off in which it then acknowledges that this amended and restated a revocable credit, extending the state of expiration date to August 11, 2005, was in fact the... How can you get back to his good question? Well, Your Honor, it was about Section 5. And Section 5 says that in the event that there is a default on the part of Citadel with respect to its obligations on the letter of credit. In other words, if the commercial paper has to be paid off, the trustee under the commercial paper immediately draws down a letter of credit. When that drawdown occurs, Citadel has to repay. And if they don't repay, that's a default. And Section 5 says that if there's any default on the part of the obligations of the Citadel entities under the reimbursement agreement, then the hospital at Antelope Valley shall immediately repurchase the ground lease. And somewhere in there, there's a letter from the bank saying it's happened, now do it. Precisely. That was Exhibit 50 in the trial court, and I can get a cite to you for that. But the bank, not only that, but every time that Citadel asked the bank to extend the stated permanent reduction date for Citadel-Lancaster, the parties all signed off on documents in which they represented and agreed that in the event of a default, that there would be an immediate purchase by Antelope Valley, the district of the ground lease, and Citadel signed off on this. And so when there was a default, the bank demanded performance. Antelope Valley said, yes, we will perform as obligated to under the support agreement. And Citadel refused, just as it had refused in 2006 to perform under the option. So that was the second occasion in which Citadel refused to participate in one of the three scenarios for unwinding this transaction, getting the financing repaid, and transferring the property and the building back to Antelope Valley. Excuse me. Could you address the mootness issue briefly? Well, Your Honor, it's very simply this, that this court has, in cases that we have cited in our brief, recognized the concept of equitable mootness. This entire transaction existed for one purpose, and that was to provide the financing that would enable the district to get this building built in the manner it wanted to get it built, i.e. with certain accounting treatments that would enable them not to have to reflect this on their balance sheet, but at the same time to get the tax benefits as owners. That was the whole purpose of the transaction. What about classic mootness? Even there, Your Honor, our position is that because the bank is not before the court, because the bank has been paid, it's done, the transaction is over, you can't put Humpty Dumpty back together again. If Citadel says, well, we're entitled to the building for 40 years, left on 50 years, we could give it back to them. If they're right about everything they're arguing. Only by working just a horrific injustice. Yeah, well, that may mean that you've got an argument on the merits, but I don't know that it's an argument about mootness. My question on mootness is, has something happened that makes it impossible for us to give relief? Well, we can't do anything with the bank. The bank's not before us, but the bank's been paid. They're okay. And if I understand your opponent's argument, he thinks that his client should get the building for 40 years, and we could certainly arrange that if we agreed with everything he said. But there is not a mechanism under the contract to do that. What would be the interpretation of the contract? I guess we'd have to reverse the district court and say that they're right about their interpretation of Section 2, and the district court is reversed and sent back for further proceedings consistent with this opinion. I don't know how long you want to argue mootness. I don't want to keep you on it. We recognize that there are the cases that say that in real property transactions, the court can always order that they essentially be rescinded and put the parties in their original position. Our argument here is simply that it would be very, very, very difficult to do that. You cannot restore the status quo ante, and that there really is no basis in these contracts for giving Citadel what it is asking for. That sounds like an argument to affirm. Was there any other point you wanted to make in your remaining time? Only that if you look at Section 2, which is really the cornerstone of their argument as to why they're entitled to get it both ways, so to speak, it says absolutely nothing about unwinding the transaction. Unlike Section 3, unlike Section 4, unlike Section 5, where the sale of the ground lease is used as the vehicle to pay off the bank and return the parties to their proper positions, there's nothing like that in Section 2. So your position is Section 2 is the section that governs as long as the money was still owed, and then 3, 4, and 5 unwound everything and Section 2 was no longer. And the proof of that, Your Honor, is that when the parties did the post-judgment sale, they utilized Section 2. There was a Section 2 payment. That's Exhibit G in the… The Section 2 payment included everything that was owed until the date of the unwinding. It included everything that was owed for the last period before the sale under Section 5. Right. I understand. So they got a payment of, you know, I think it was $40,000 as opposed to $2 million plus. Their argument is that you just simply forget Section 5. You pretend that the bank didn't demand performance, and you use Section 2 and the provision in Section 2 that says they get an 8% kicker every month, and you plug in the $20 million, all the financing, and you use your kicker, and all of a sudden you get $1.6 million. Over the life of the loan. Well, that's what they would say that Antelope Valley was obligated to pay as soon as the default occurred. I understand your argument. Okay, you've exceeded your time. One minute for rebuttal, please. I'd like to first suggest that there's an intermediate outcome, and that is that we're entitled to the judgment under Section 2. You stay with the way the court decided on Section 5, and they get a credit for what they paid under Section 5 for the amount they owe us under Section 2, if your decision is that the contract taken as a whole entitles them to the building. But I'd like to reiterate that Section 2 expressly says that that payment formula in that section applies at maturity. Those words are in Section 2. So that an outcome here could be that you reverse on Section 2, affirm on Section 5, and they owe the differential between the Section 2 calculation and what they paid under Section 5. The amount due under Section 2 is more than what was paid under Section 5. What would be that amount? How much would that be? It's around numbers 5% of the $20 million. Because Section 5 has the percentage calculation at 3% of the original amount of the financing. Section 2 has it at 8% of the amount outstanding. About $500,000 had been paid down during the term, so it's the difference between 8% of $20 million round numbers and 3% of $20 million round numbers. The court basically read the words at maturity out of Section 2. If you take the logic that's been advanced about the option and you say that every time the stated expiration date of the letter of credit was extended, that the option was extended, the option would expire sometime off in the future. It has not even expired yet, even though this financing has matured. That's not a reasonable interpretation, because these other projects that were added had maturities that were longer than this one. So the option would not yet have expired, even though this financing has matured. That's not a logical interpretation of the contract. As far as Section 5 is concerned, what we say makes no sense is that they can create the default by not paying under Section 2 and then take advantage of that default and turn Section 5, which was intended as a remedy, into what is in substance an exercise of the option that has expired. But the bank controlled that, right? The bank sent one letter saying that you're in default and you need to pay and you're obligated to purchase under Section 5. But the bank did not pursue that and did not in any way seek to control the exercise of remedies by Citadel. Citadel was in charge of the exercise of remedies and enforcing the contract based on the default of Antelope Valley that occurred when they didn't pay. So I think the bank demand was just that, a demand. But the bank did not attempt in any way to preclude Citadel from exercising the remedies under the support agreement. But once the bank does its demand, what else is there left to do for the bank to exercise its rights as the lender? To join in the litigation, to seek to do something about it. I just submit to you that I don't know how consistent with the contract one can come to the conclusion that Citadel was not entitled to a judgment under Section 2 of the support agreement. I understand your argument. Thank you to both counsel for your arguments. The case just argued is submitted for a decision by the court. That concludes our calendar for the day. We will be in recess until 9 o'clock a.m. tomorrow morning.
judges: Canby, Rawlinson, Smith N. R.